UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

ROMAIN R. BRANCH,                                           ECF CASE

                          Plaintiff,

            -against-
                                                            18 CV 09516 (AT)(DCF)
STATE UNIVERSITY OF NEW YORK
and AYMAN FANOUS, Individually and
as Chair of the Department of Psychiatry,
STATE UNIVERSITY OF NEW YORK
DOWNSTATE MEDICAL CENTER,

                          Defendants.
--------------------------------------------------------X


PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT


LAW OFFICE OF SANDRA D. PARKER

By:    Sandra D. Parker
       110 East 59th Street, Suite 3200
       New York, NY 10022
       (212) 317-2883
       Attorney for Romain R. Branch
                  Plaintiff

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITY..................................................................... iii

PRELIMINARY STATEMENT.................................................... 1

STATEMENT OF RELEVANT FACTS......................................... 2

      Dr. Branch's Association With The Training Program....................... 3

      Fanous' Demand That Dr. Branch Provide Between
      Two and Two and Half Days Of Clinical
      Services at KCH.................................................................................. 8

      Dr. Branch's First Complaints To
      Downstate's EEO Office Of Diversity
      And Inclusion..................................................................................... 11

      Associate Program Director................................................................ 13

      The Non-Renewal Notice and
      Removal As Director........................................................................... 14

      Complaints To ODI/Human Resources 15

      The Comprised ODI Investigation
      and Evaluative Review Process........................................................... 16

ARGUMENT

      THERE ARE DISPUTES ISSUES OF MATERIAL
      FACT AS TO WHETHER DR. BRANCH WAS
      SUBJECT TO ADVERSE ACTION UNDER
      CIRCUMSTANCES GIVING RISE TO AN
      INFERENCE OF DISCRIMINATION............................................... 18

Inference of Discrimination............................................................. 19

Pretext.............................................................................................. 21

Qualified Immunity.......................................................................... 23

i

NYCHRL Claims...................................................................................... 23

Retaliation............................................................................................ 21

CONCLUSION...................................................................................... 25

# TABLE OF AUTHORITY

*Abdu-Brisson v. Delta Airlines, Inc.*
    239 F. 3d 456 (2d Cir. 2001)........................................................................ 19

*Albunio v. City of New York*
    16 N.Y. 3d. 472 (2011)............................................................................. 24

*Chambers v. TRM Copy Center Corp.*
    43 F. 3d 29 (2d Cir. 1994)...................................................................... 19, 22

*Hollander v. American Cyanamid*, 172 F. 3d 192 (2d Cir. 1999)
    *abrogated on other ground, by Schanabel v. Abramson*
    232 F. 3d 83 (2d Cir. 2000)....................................................................... 20

*Johnson v. County of Nassau*
    82 F. Supp. 3d 533 (E.D.N.Y. 2015)......................................................... 24

*Lewis v. Triborough Bridge and Tunnel Authority*
    2001 WL 46986 at * 2, 97 CV 0607 (Jan. 18, 2001)
    *aff'd,* 31 Fed. App'x 746 (2d Cir. 2002)................................................. 20

*LittleJohn v. City of New York*
    795 F. 3d 297 (2d Cir. 2015)..................................................................... 20

*Mangaroo v.Boundless Technologies, Inc.*
    253 F. Supp. 2d 390 (E.D.N.Y. 2000)....................................................... 19

*Martin v. MTA Bridges and Tunnels*
    610 F. Supp. 2d 238 (S.D.N.Y. 2009)........................................................ 20

*McGuinnes v. Lincoln Hall*
    263 F. 3d 49 (2d Cir. 2001)........................................................................ 19

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*
    715 F. 3d 102 (2d Cir. 2013)..................................................................... 24

*Pearson v. Callahan*
    555 U.S. 223 (2009)................................................................................. 23

*Reeves v. Sanderson Plumbing Prds., Inc.*
    530 U.S. 133 (2000)............................................................................ 23

*Segendorf-Teal v. County of Ressenlear*
    100 F. 3d 270 (2d Cir. 1996)............................................................ 24

*Sethi v. Narod*
    12 F. Supp. 3d 505 (E.D.N.Y. 2014).......................................... 19, 20, 21

*Siani v. SUNY at Farmingdale*
    7 F. Supp. 3d 304 (E.D.N.Y. 2014)................................................. 23

*Soloviev v. Goldstein*
    104 F. #d 232 (E.D.N.Y. 2015)........................................................ 23

*Tomka v. Seiler Corp.*
    66 F. 3d 1295 (2d Cir. 1995) *abrogated on other grounds by*
    *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998)...................... 24

*University of Texas Southwestern Medical Center v. Nassar*
    570 U.S. 338 (2013)......................................................................... 22

*Windham v. Timer Warner Inc.*
    275 F. 3d 179 (2d Cir. 2001)............................................................ 23

*Zimmerman v. Associates First Capital* Corp.
    251 F. 3d 376 (2d Cir. 2001)............................................................ 20

**Statutes**

42 U.S.C. § U.S.C. §2000e *et seq*.................................................... 1

42 U.S.C. §1983................................................................................ 1

42 U.S.C. §1981................................................................................ 1

Fed. R. Civ. P. 72.............................................................................. 22

N.Y. Exec. L. §290 *et seq*............................................................... 1

N.Y.C. Admin. Code §8-101 *et seq*.......................................... 1, 23, 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
ROMAIN R. BRANCH,                                                    ECF CASE

                              Plaintiff,

             -against-

STATE UNIVERSITY OF NEW YORK                              18 CV 09516 (AT)(DCF)
and  AYMAN FANOUS, Individually and
as Chair of the Department of Psychiatry,
STATE UNIVERSITY OF NEW YORK
DOWNSTATE MEDICAL CENTER,


                              Defendants.

---------------------------------------------------x

## PRELIMINARY STATEMENT

On or about October 18, 2018, Dr. Romain Branch commenced this action asserting

claims pursuant to 42 U.S.C. §2000e *et seq,* 42 U.S.C. §1983, 42 U.S.C. §1981, the New York

State Human Rights Law, N.Y. Exec. L. §290 *et seq,* (NYSHRL), and the New York City Human

Rights Law, N.Y.C. Admin. Code §8-101 *et seq.* (NYCHRL) against Defendants State University

of New York (SUNY) and Ayman Fanous (Dr. Fanous). The  Complaint alleged that Defendants'

engaged in discriminatory conduct, created a hostile work environment based on Dr. Branch's

African-American race and his Caribbean origins, and retaliated against Dr. Branch for

complaining of their discriminatory conduct.

Dr. Branch filed a Third Amended Complaint and Jury Demand (TAC), on or about

October 11, 2019.  Thereafter, Defendants moved to dismiss the TAC.  In an Order dated July 20,

2020 the Court granted in part and denied in part their motion, by first denying dismissal of his

federal and state disparate treatment claims asserted against them. ECF 114 at 11.  The Court next

dismissed his federal and state law claims of retaliation and hostile work environment.  ECF #114 at 12, 14.  In the Order, the Court also dismissed any claims Branch asserted pursuant to the NYCHRL against Fanous in his official capacity, but denied Defendants' motion to dismiss the NYCHRL claims asserted against Dr. Fanous in his individual capacity.

Defendants now seek summary judgment.  The motion should be denied as there are disputed issues of material fact as to whether Dr. Branch was subject to discriminatory treatment based on his race and country of origin.  The Court should also revisit its decision regarding retaliation, given the development of the record in this case.

## **STATEMENT OF RELEVANT FACTS**

Dr. Branch is an African-American who was born in Barbados, an Island Country in the Caribbean region of North America.  Declaration of Dr. Romain Branch dated April 28, 2021 (Branch Decl.), para. 4-5.

For approximately five years, beginning in or about August 2003 he had been associated with the SUNY Adult Psychiatry Residency Training Program (the Training Program or the Program).  Branch Decl., para. 14-15, 21-23, 35 and 173. The Training Program is a four-year program accredited by the Accreditation Council of Graduate Medical Education (ACGME) and is sponsored  by SUNY Health Science Center at Brooklyn, which provides post-graduate medical education. Branch Decl., para. 16.

The Program has a complement of forty-eight (48) residents who complete rotations at six participating sites throughout Brooklyn. Branch Decl., para. 17.  There were a total of six Training Program participating sites located at the following facilities: Kings County Hospital, Kings Brook Jewish Medical Center; Kingsborough State Psychiatric Center; Coney Island Hospital;

University Hospital Brooklyn; and Brooklyn Veterans' Administration Medical Center. The University Hospital Brooklyn is physically located within Downstate. Branch Decl., para. 18.

None of the three previous Caucasian Program Directors, Dr. Stephen Goldfinger, Dr. Michael Garrett and Dr. Michael Myers  provided any services or did any on site work at any of the six (6) participating sites including at Kings County Hospital.  Branch Decl., para. 24-25.  Dr. Myers held the position for five years.  During those five years he did not provide any services or perform any on site work at the participating sites, including at Kings County Hospital. *Id.*

**Dr. Branch's Association With The Training Program**

Dr. Branch was appointed to the voluntary faculty position of Clinical Assistant Professor in September 2013 at the SUNY Downstate Medical Center (Downstate), while working as a primary preceptor in the addiction psychiatry of Kings County Hospital (KCH). Branch Decl., para. 14-15, 21-23. In or about 2014, approximately a year after he began his work in the Training Program, the in-patient unit at Downstate closed down.  Only two Program residents rotated at any one time at the Downstate in-patient unit, and when it closed they were transferred for rotation at KingsBrook Jewish Medical Center.  Branch Decl., para. 28-29.

In or about October 2015, Dr. Branch interviewed for the position of Director of the Training Program (Program Director) and the faculty position of Clinical Assistant Professor of Psychiatry, in the Psychiatry Department at Downstate, appearing for the interview, before members of the State University of New York (SUNY) Graduate Medical Education (GME) Committee. Branch Decl., para. 32-34.

No one from KCH was involved in the interview, selection and decision making process regarding his employment as Program Director and Clinical Assistant Professor.  Branch Decl.,

para. 33.  The Program Director is the second highest ranking person in the Downstate

Department of Psychiatry (Psychiatry Department or Department), with the Chair of the

Department holding the highest ranking position. Branch Decl., para. 30.   In 2015,  Dr. Stephen

Wadowski was the Designated Institution Official (DIO) and the chair of the GME Committee.

Branch Decl., para. 34. The DIO is responsible for overseeing the Training Program and insuring

its compliance with the ACGME requirements.  *Id.*  When Dr. Branch became the Program

Director, he was first and only African-American and African-American of Caribbean descent

who ever held the position. Branch Decl., para. 36.

Dr. Branch's total compensation as Program Director and Clinical Assistant Professor was

$210,000.00, with a base compensation of $108,432.00.  See Exhibit 2 annexed to Branch Decl.

That total  compensation was constructed as follows:

| | | |
|---|---|---|
| Base | $50,000 | paid by Downstate |
| Base | $58,432 | paid pursuant to  Kings County Hospital Affiliation Agreement |
| Additional Pay | $98,542 | paid by Downstate |

Location Pay   $3,026 paid by Downstate

See Exhibit 39, October 6, 2015 letter from Dr. Goldfinger to Dr. Carlos Pato, annexed to the

Declaration of Sandra D. Parker, submitted in opposition to Defendants' motion for summary

judgment (Parker Decl.).

Approximately twenty-seven percent (27%) of his total compensation and approximately

fifty percent (50%) of his base compensation was paid pursuant to a KCH Affiliation Agreement.

Exhibit 40, November 2015 Personnel Commitments Financial Review, annexed to Parker Decl.

4

The remaining seventy-three per cent (73%) of his total compensation and forty-six percent (46%) of his base compensation was paid by Downstate.  Exhibit 40.

The above described compensation distribution continued, after he was removed as Program Director on or about March 15, 2018.  Branch Decl., para. 40 and Exhibit 41, Notification of Employee Change of Status annexed to Parker Decl.  After Defendants removed Dr. Branch as Program Director, he continued to receive twenty- seven percent (27%) of his total compensation and approximately fifty percent (50%) of his base compensation pursuant to the KCH Affiliation Agreement.  Branch Decl., para. 41 and Exhibit  41 annexed to Parker Decl.  When Dr. Branch began working as Program Director, Dr. Carlos Pato, who is  Caucasian was the Dean of Downstate.  Branch Decl., para. 44.

The only staff privileges Dr. Branch was required to obtain and maintain as Program Director were medical staff privileges the University Hospital of Brooklyn, located at Downstate.  Branch Decl., para. 45 and Exhibit 2 annexed thereto.  Although there were discussions between Renuka Ananthamoorthy, MD-Chief of Service in Psychiatry at Kings County Hospital, Dr. Goldfinger, Dr. Whitley and Lauren Gabelman-Administrator-Department of Psychiatry at Downstate about Dr. Branch providing clinical services at KCH in the Division of Chemical Dependency, Dr. Goldfinger took the position that he would not provide those on site services.  Branch Decl., para. 46-49.  Dr. Branch's Job Description also does not require him to provide on site services at KCH.  See Exhibit 4 annexed to Branch Decl.  No changes were made to that Job Description during Dr. Branch's employment.  Branch Decl., para. 48.

The ACGME does not require directors of residency training programs to provide on site supervision at any of the sites affiliated with the training programs.  Branch Decl.,

para. 51 and Exhibit 5 annexed thereto, ACGME Program Requirements for Graduate Medical Education in Psychiatry (ACGME Requirements), para. II.A.-II.A.4.q.

Pursuant to para. I.B.1(a) of the ACGME Requirements, on or about July 1, 2016 there was issued a Program Letter of Agreement regarding KCH, one of the six (6) sites affiliated with the Program (Program Letter).  Branch Decl., para. 52 and Exhibit 6 annexed hereto, a copy of the Program Letter. There is nothing in the Program Letter that requires the Program Director to provide on site clinical supervision of the residents at KCH.   That responsibility is placed on the Site Director of KCH.  Branch Decl., para. 53. In 2016, when Dr. Branch  and Dr. Goldfinger executed the Program Letter he was not the Program Director at KCH Hospital and Dr. Goldfinger was not the Program Director at the SUNY Health Science Center at Brooklyn (SUNY HSCB).  Branch Decl., para. 54, and Exhibit 6, p.1.See Exhibit 6.

On or about August 2016 Dr. Goldfinger was replaced as Chair of the Psychiatry Department by Dr. Ayman Fanous.  Branch Decl., para. 56.   Upon information and belief, Dr. Carlos Pato the then Dean of the  Downstate Medical School hired Dr. Fanous to replace Dr. Goldfinger as Chair of the Psychiatry  Department, and Dr. Fanous reported directly to Dr. Carlos Pato. Branch Decl., para. 57-58

In or about October 2016, Dr. David Wlody who is Caucasian, replaced Dr. Stephen Wadowski, as the DIO.  Dr. Wlody did not participate in the interview, selection and decision process regarding Dr. Branch's employment as Program Director and Clinical Assistant Professor. He had no involvement in the Program prior to being named the new DIO.   Branch Decl., para. 60. Dr. Michele Pato who is Caucasian and the spouse of Dr. Carlos Pato worked in the Program, as vice chair of research.  Branch Decl., para. 61

Throughout the latter part of 2016 when Dr. Fanous replaced Dr. Goldfinger as the Department Chair and throughout 2017, Dr. Branch continued to perform the duties and responsibilities described in the Job Description, which did not involve providing on site services or on site clinical supervision at KCH. No one including Dr. Fanous and Dr Wlody raised any concerns.  Branch Decl.  62-67.

In fact, in January 2017, Dr. Fanous requested that Dr. Branch's temporary appointment status be changed to a two year term appointment. Branch Decl., para. 68-69, and Exhibit 7 annexed thereto, a copy of the January 23, 2017 letter from Dr. Fanous to Dr. Pato.

Among the many committees of which Dr. Branch was the chair was the Educational Policy Committee, of which Dr. Michele Pato, was a member.  Branch Decl., para. 70.  During one of the Educational Policy Committee meetings, specifically on September 12, 2017, Dr. Michele Pato entered the room where the meeting was being held and began shouting and berating Dr. Branch about having begun the meeting, and discussing the upcoming recruitment season without her, stating that he should have waited for her presence before starting. Branch Decl., para. She was disruptive, rude and disrespectful.  Branch Decl., para. 71.  After Dr. Branch complained to Dr. Fanous and Dr. Wlody about her behavior, they said she would stop working with the Program.  Branch Decl., para. 72.

Following the incident with Dr. Michele Pato, Dr. Fanous became distant and uncommunicative regarding Dr. Branch's work on the Program, and in particular,  cancelling at the last minute the weekly meetings he held with Dr. Branch to discuss the Program and projects Dr. Branch  proposed and on which he was working; failing to reschedule the cancelled meetings and to provide Dr. Branch with requested responses regarding issues related to the Program.

7

Branch Decl., para. 73, 74,76, 78 and  Exhibit 8 annexed hereto, September 22, 2017 email to Dr.

Fanous regarding his failure to respond to follow up issues, and September 27, 2017 and

September 28, 2017 emails regarding his last minute cancellation of the weekly meeting; Exhibit

9 annexed thereto, November 2, 2017 email to Dr. Fanous asking him to provide sufficient notice

of cancelled meetings; and Exhibit 10 annexed thereto, December 20, 2017 email to Dr. Fanous

regarding his last minute cancellation of the weekly meetings.

 Dr.  Fanous' failure to attend and/or his delay in holding the weekly meetings

with Dr. Branch presented him with challenges in performing the oversight required by the

ACGME and effectively operate the Program, including preventing the establishment a new

clinical rotation site needed to meet the Program's educational standards and the standards of

ACGME.  Branch Decl., para. 75, 78.

**Fanous' Demand That Dr. Branch Provide**
**Between Two and Two and One Half Days**
**Of Clinical Services at KCH**

 As discussed fully below, during the Fall of 2017 and continuing up to March 15, 2018

when Dr. Fanous and Dr. Wlody removed Dr. Branch as Program Director, Dr. Fanous first stated

that because of a contract being negotiated or renegotiated between KCH and Downstate, Dr.

Branch may need to provide half a day of clinical services at KCH, then increased that time

allotment to between 40% or 50%  (or between two and two and half days).  However, after

removing Dr. Branch as Program Director, they replaced him with Dr. Ramawanathan

Viswanathan (Viswanathan), who is of Indian descent and whom they did not require to provide

any on site services at KCH.  Thereafter, they hired Dr. Scot McAfee, a Caucasian as the Program

Director on a part time basis with him working only four days a week, and only provides one day

of site clinical supervision at KCH.   That is a sharp contrast with the two and half days, Dr.

Fanous demanded Dr. Branch provide at KCH.

During a September 7, 2017 weekly meeting with Dr. Fanous, he first stated

to Dr. Branch, that Downstate and KCH were renegotiating "contracts" between them, that Dean

Carlos Pato was involved in those negotiations on  behalf of Downstate.  Branch Decl., para. 79.

He also said that because of these negotiations Dr. Branch may have to provide half a day or ten

percent (10%) of Full Time Employment (FTE) of clinical work at KCH.  *Id.*  Dr. Fanous raised

this issue only during the weekly meetings with Dr. Branch.  Branch Decl., para. 80-81.  Dr. Wlody

never mentioned the issue to Dr. Branch until March 15, 2018, when he and Dr. Fanous removed

Dr. Branch as  Program Director.  Branch Decl., para. 81.

Dr. Fanous never pointed or even mentioned the October 15, 2015 letter of Dr. Goldfinger

as requiring Dr. Branch to provide the on site clinical services. Branch Decl., para. 83-83.  In fact,

on September 7, 2017 Dr. Branch  sent and referred Dr. Fanous to the Goldfinger Letter as support

for his position that his job duties did not involve providing on site clinical work at KCH, to which

Dr. Fanous gave no response.  Branch Decl., para. 85 and Exhibit 11 annexed hereto, September 7,

2017 email to Dr. Fanous.

More than a month later, on October 26, 2017, Dr.  Fanous again raised the issue of

Dr. Branch providing on site clinical services at KCH, but this time the possibility of providing

half a day of on site clinical services at the hospital was now increased to between forty percent

(40% or 2 days) and fifty percent (50% or 2 ½ days) of clinical service at the hospital. Branch

Decl., para. 86.  Without providing Dr. Branch with any documentation regarding this change in

his duties and the funding, Dr. Fanous stated that Dr. Branch would have to begin the on site work

at KCH.  Branch Decl., para. 86-87.

Neither Dr. Fanous nor anyone else provided the Office of Diversity and Inclusion (ODI), which is charged with investigating discrimination complaints at Downstate with any evidence, documentary or otherwise of this alleged change in funding which required Dr. Branch to provide on site services at KCH.  See Exhibit 47, p. 01566 annexed to Parker Decl., April 20, 2018 memorandum of Shaundelle Moore Goldsmith, where she writes that "neither Dr. Fanous nor Dr. Pato provided documentation of the deliberations between" KCH and Downstate.

At the November 7, 2017 weekly meeting, Dr. Fanous again raised the issue and in a follow up email he said that KCH would fund one hundred percent (100%) of the Program Director's salary and stated that Dr. Branch would have to start performing up to 50% of FTE or two and one half days of on site services at KCH, beginning January 1, 2018.  Branch Decl., para. 88 and Exhibit 12 annexed thereto, Dr. Fanous' November 7, 2017 email.  He also said the Training Program was relocating to KCH.  See Exhibit 12.

The  day following the  November 16, 2017 meeting, Dr. Fanous said if Dr. Branch did not agree to the changes he would be reassigned.  Branch Decl., para. 97 and Exhibit 13 annexed thereto, 2017 November 13, 15, 20 emails to Dr. Fanous. After the residents were informed about the move to KCH, they circulated a petition opposing the move.  Branch Decl., para. 100-102 and Exhibit 14 annexed hereto, December 1, 2017 email to Program residents, and Exhibit 15 annexed thereto, December 13, 2017 email from Dr. Fanous.

In a meeting hastily called with the residents, Dr. Fanous told them the move would not take place.  Branch Decl., para. 103-104 and Exhibit 16 annexed thereto, December 8, 2017 and December 11, 2017 emails from Dr. Fanous regarding meeting with the residents; Exhibit 17

10

annexed thereto, December 11, 2017 email from Dr. Fanous' secretary Catherine Cozzolo

scheduling a December 13, 2017 meeting with the residents.  Dr. Fanous never provided Dr.

Branch with an explanation for the sudden reversal of the relocation decision.  *Id.*, and Exhibit 18

annexed thereto, December 14, 2017 Fanous email.

　　　During the latter part of 2017 Dr. Branch hired Dr. Occhiogrosso  to work at

at KCH.  Dr. Occhiogrosso was hired for the position of KCH Site Director.  Branch Decl., para.

107.  He provided the residents at KCH with on site clinical supervision. Branch Decl., para. 108-

110

**Dr. Branch's First Complaints To
Downstate's EEO Office Of Diversity
And Inclusion**

　　　On or about December 1, 2017 Dr. Branch called the Downstate Office of Diversity and

Inclusion (ODI) to complain about the conduct of Dr. Fanous.  On or about that date Dr. Branch

met with Ms. Moore-Goldsmith.  Branch Decl., para. 111 and  Exhibit 20 annexed thereto,

December 1, 2017 email from Tahitia Williams.

　　　During the meeting with her, Dr. Branch described among other conduct, Dr. Fanous'

behavior of cancelling meetings, not rescheduling them, not being responsive to his requests for

assistance and approval of projects, and a general deterioration of their relationship. Branch Decl.,

para. 112-113.  He explained that these issues arose, after he complained about the conduct of Dr.

Michele Pato during the September 12, 2017 committee meeting, and stated that he believed her

behavior may have been directed against him because of her status as a Caucasian spouse of the

Dean of the School of Medicine, Dr. Carlos Pato. Branch Decl., para. 114-115.

　　　She asked Dr. Branch to outline the events that occurred which gave him concern, and he

did so in a December 6, 2017 submission to her. Branch Decl., para. 115 and Exhibit 21 annexed

thereto Summary of Concerns 12-06-17. She then referred the matter to Kevin Antoine (Antoine)

the head of ODI. Branch Decl., para. 116-117 and Exhibit 22 annexed thereto, December 14, 2017

Moore-Goldsmith email; Declaration of Kevin Antoine dated April 21, 2021 (Antoine Decl.), para.

16-27. Mr. Antoine treated Dr. Branch's complaints as an informal complaint. Antoine Decl.,

para. 11, 16.

   Mr. Antoine met with Dr. Branch and Dr. Fanous in an effort to mediate the matter.

Branch Decl., para. 117 and Exhibits 23 annexed thereto, 2017 December 14, 20 and 21 email

exchanges with Mr. Antoine. During the meeting with Mr. Antoine, Dr. Fanous told him he would

not discriminate against Dr. Branch. Antoine Decl. , para. 17. While the relationship with Dr.

Fanous improved for a short period of time it then  then deteriorated.

  Approximately two months following the ODI complaint, beginning on or about February 6, 2018

Dr. Fanous and Dr. Pato made the decision to not renew Dr. Branch's faculty appointment as a

Clinical Assistant Professor at Downstate. See Exhibit 44 annexed to Parker Decl., February 7,

2018 email exchange between Dr. Carlos Pato and Karen Saunders of Downstate's Human

Resources about starting the process to issue Dr. Branch a notice of non-renewal of his term

contract. Pursuant to those plans, on February 9, 2018 Dr. Fanous recommended that Dr. Branch's

term appointment which ended on December 31, 2018 not be renewed, while Dr. Carlos Pato and

Wayne J. Riley, the President of Downstate accepted that recommendation. Exhibits 45 and 46

annexed to Parker Decl., President Riley's June 1, 2018 memorandum and Dr. Carlos Pato's

February 28, 2018 memorandum.

   Approximately three months following Dr. Branch's complaint to ODI, on

March 15, 2018 Dr. Fanous and Dr. Wlody removed Dr. Branch as Program Director and replaced him with someone who did not provide any services at KCH and who did not have an office at KCH.  Branch Decl., para. 119, 161-163..

**Associate Program Director**

Downstate did not have an Associate Program Director when Dr. Branch. Branch became the Program Director.  Branch Decl., para. 121. Not having an Associate Program Director meant that he was required to dedicate forty (40) hours to the administration of the Program. He had to work overtime to provide the required administrative time to ensure that the Program functioned smoothly. *Id.*

While Dr. Ellen Berkowitz provided some help with the administration of the Training Program, she was never the Associate Program Director, and lacked the qualifications for the position.  Branch Decl., para. 122-123 and Exhibit 24, 2015 Department of Psychiatry Organizational Chart, and Exhibit 25, March 1, 2016 Division of Education Department of Psychiatry chart annexed thereto.  Dr. Berkowitz was not a licensed physician and could not provide clinical supervision of residents in any capacity or address any administrative issues which required a licensed physician. Branch Decl., para. 124.

Dr. Branch often communicated to Dr. Fanous and Dr. Wlody that in order to be in compliance with ACGME core requirements and not at risk of citation, an Associate Program Director needed to be hired to fulfill the forty (40) hours of dedicated time of direct administration of the Program.  Branch Decl., para. 127-129.  As an alternative to working without the Associate Program Director, he suggested relinquishing clinical duties on the C/L Service at Downstate.

In or about September 27, 2017 Dr. Branch asked Dr. Fanous to relieve him of all clinical

duties to ensure that the Training Program became compliant with the requirements of the

ACGME, minimize any risk of citation from the ACGME, and to get time needed to complete the

first self-study of the Program.  Branch Decl., para. 130-131, and Exhibit 19, p. 000025, ¶1,

annexed thereto. He denied the request.

On February 6, 2018 during an email exchange with Dr. Ananthamoorthy of KCH inquiring

about Dr. Branch's clinical privileges at the hospital, Dr. Branch responded because he would not

be doing clinical work at KCH and he had to relinquish the privileges.  Branch Decl., para. 132-

133, and Exhibit 27 annexed hereto February 6, 2018 email exchange with Dr. Ananthamorthy.

Dr. Fanous was fully aware of this issue as it appeared on the agenda for the February 7, 2018 and

February 14, 2018 weekly meeting.  Exhibit 28 annexed to Branch Decl.,  updated post February 7,

2018 meeting agenda, and Exhibit 29 annexed to Branch Decl.,  February 14, 2018 meeting

agenda.   He said nothing when Dr. Branch told him about relinquishing the privileges.  Branch

Decl., para. 139-140.

**The Non-Renewal Notice And
Removal As Program Director**

During the February 14, 2018 weekly meeting Dr. Fanous gave Dr. Branch

a memorandum dated February 9, 2018 addressed to Dr. Carlos Pato, where Dr. Fanous

recommended the non-renewal of his term appointment as Clinical Assistant Professor.  Branch

Decl., para. 141 and Exhibit 30 annexed thereto, February 14, 2018 email to Dr. Fanous, and

Exhibit 31, February 9, 2018 memorandum from Dr. Fanous to Dr. Carlos Pato.

Dr. Fanous again stated that KCH would be funding one hundred percent (100%) of the

Program Director's position, but could not state when that funding would begin. Branch Decl.,

para. 142 and Exhibit 32 annexed thereto, February 27, 2018 email to Dr. Fanous.  Dr. Fanous

previously stated that the funding would begin on January 1, 2018.   *Id.,* and Exhibit 12 annexed hereto.

Now he was not sure when the funding would begin.  See Exhibit 30 annexed to Branch Decl. He also stated that what he meant by the "reallocation resources" used in the non-renewal notice was a "realignment of" the Downstate and KCH relationship.  Branch Decl., para. 143 and Exhibit 32, February 28, 2018 Fanous email.

However, no one on behalf of Dr. Fanous or anyone else has produced any documentation of this alleged "realignment." See Exhibit 33 annexed to Branch Decl. Dr. Branch was the only Clinical Assistant Professor in the Department whose contract was not renewed.  Branch Decl., para. 146.

On March 18, 2018 during a meeting with Dr. Fanous and Dr. Wlody they removed Dr. Branch as Program Director, effective immediately.  Branch Decl., para. 151-152 and  Exhibit 34 annexed thereto, March 15, 2018 email exchanges with Dr. Fanous.

**Complaints To The ODI/Human Resources**

In March 2018 and April 2018 Dr. Branch filed several complaints with ODI and the Department of Human Resources, regarding the non-renewal of his term contract, his demotion from the position of Program Director and the treatment he was receiving during his employment in the Department. See Exhibits 35,  March 23, 2018 summary of concerns; Exhibit 36 March 26, 2018 non-renewal response; and Exhibit 37,  April 16, 2018 complaint, annexed to Branch Decl.

After Dr. Carlos Pato accepted Dr. Fanous' recommendation to not renew his term appointment as Clinical Assistant Professor and forwarded it to President Riley, for review, approval or rejection, Dr. Branch submitted a rebuttal to the recommendation, pursuant to

15

Downstate's Evaluative Process. See Exhibit 37 annexed to Branch Decl., the Rebuttal and

complaint, and Exhibit 48 annexed to Parker Decl. On or about April 20, 2018 Ms. Moore-

Goldsmith wrote that she had not found any discrimination or retaliation. See Exhibit 38 annexed

to Branch Decl. April 20, 2018 Letter.

In a memorandum dated June 1, 2018 President Riley accepted the recommendation to not

renew Dr. Branch's faculty appointment as Clinical Assistant Professor.  See Exhibit 45 annexed

to Parker Decl., President Riley's non-renewal decision.  Dr. Branch's term employment would

end on June 20, 2019 or approximately a year after the non-renewal notice and decision.

**The Compromised ODI Investigation
And Evaluative Review Process**

During Mr. Antoine's  ten years with Downstate, the active complaint process and the

investigation of the complaint were kept confidential.  Antoine Decl., para. 10..  The complaints

Dr. Branch brought to ODI, both of his informal and formal complaints are the only complaints

that were not kept confidential, but were shared with Downstate Department of Human Resources

and President Wayne J. Riley.  Antoine Decl., para. 11. This was due to the fact that President

Riley removed ODI from reporting to the President to reporting to Human Resources,

notwithstanding that SUNY Diversity Policy mandated that Chief Diversity Officer report to the

campus President or Provost.   Antoine Decl., para. 12.

In the Department of Human Resources complaints were not kept confidential and were

shared within the Department of Human Resources and with President Riley, during the active

complaint process and investigation and before ODI completed its investigation. *Id.*  This

interference compromised the efficacy of the entire ODI complaint process and investigation.

Antoine Decl., para. 13.   It also tainted the non-renewal process, which involved President Riley's review of the recommendation to not renew Dr. Branch's employment contract, Dr. Branch's submission of arguments for him to reject the recommendation, and President Riley making the decision to accept or reject the recommendation of non-renewal. Antoine Decl., para. 14, 23-27.

Dr. Branch's complaints also should have tolled all administrative action until it was completed, but that was not done in this case. Antoine Decl., para. 27-33.  His removal as Program Director and the notice of no-renewal should not have been done during this tolling period.  *Id.* Mr. Antoine did not receive any explanation why the tolling did not go into effect for Dr. Branch. Antoine Decl., para. 31.

**Additional Discriminatory and Retaliatory Conduct**

After removing him as Program Director, Fanous appointed Dr. Viswanathan as the Interim Program Director, and did not require him to provide any on site services at KCH.  Branch Decl., para. 160-163.  After his removal as Program Director and following his complaints of discrimination and retaliation, Dr.  Branch was excluded from each and every meeting held in the Department, and Dr. Fanous demanded he increase by approximately forty percent (40%) the clinical work of seeing patients. Branch Decl., para. 165-172.  Yet Dr. Feola, who is Caucasian was not required to increase the amount of time he spent providing clinical services.  Dr. Fanous allowed Dr. Feola to devote approximately forty percent (40%) of his time  to performing clinical duties. Branch Decl., para. 172.

17

## ARGUMENT

### THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO WHETHER DR. BRANCH WAS SUBJECT TO ADVERSE ACTION UNDER CIRCUMSTANCES GIVING INFERENCE TO AN INFERENCE OF DISCRIMINATION

In this action the Defendants SUNY and Fanous argue for dismissal of the TAC, on the ground that Dr. Branch cannot make a prima facie fo discrimination, first based on the incorrect premise that Dr. Branch's removal as Program Director and termination do not constitute adverse action.  This appears to be Defendants' argument as to both conducts, although they do not specify the conduct that allegedly does not constitute adverse.  They further argue that all the  Defendants were doing was enforcing the terms of employment.

   However, Defendants were not enforcing the terms of employment because the terms of employment did not require Dr. Branch to provide on site clinical services at KCH.   What Defendants were doing and what they, and in particular Dr. Fanous told Dr. Branch they were doing is changing the terms of employment because of some negotiated or renegotiated contract between KCH and Downstate, which they never produced for Dr. Branch, did not produce for ODI and did not produce during discovery.

According to Dr. Fanous, under the new contract KCH was to fund 100% of the Program Director's salary.  Yet KCH funds only a portion not 100% of Dr. McAfee salary, the person whom they hired on a part-time basis as Program Director.   See Rule56.1Statement, para. 55, last sentence and Dr. Branch's Response.  Instead of the promised 100% now it is a partial

18

funding(according to Dr. Fanous) or a substantial funding but not total funding  (according to Dr.

McAfee).  *Id.*  Defendants have yet to disclose the percentage of Dr. McAfee's salary that is paid

by KCH.

Moreover, neither the Goldfinger Letter nor Dr. Branch's  Job Description requires him to

perform on site work.  Cognizant of that fact, Dr. Fanous based his demand that Dr. Branch

perform on site clinical services at KCH, an alleged new funding arrangement, which he failed to

produce for Dr. Branch during his employment, failed to produce for the ODI and failed to produce

in this action during discovery.

For that reason, the cases on which Defendants rely to support their argument are not

germaine to the issues presented in this case.  *See, e.g. Martin v. MTA Bridges and Tunnels,* 610 F.

Supp. 2d 238, 254 (S.D.N.Y. 2009)(adding responsibilities and being given extra work without

compensation). In this case Defendants removed Dr. Branch as Program Directed and declined to

renew his faculty appointment, under conditions which were tainted by President Riley's

corruption of the ODI and Evaluative Review Process.

**<u>Inference of Discrimination</u>**

Next Defendants appear to advance the argument that the similarly situated test is the only

mechanism available  for Dr. Branch to raise an inference of discrimination.  However they are

mistaken. *See, McGuinnes v. Lincoln Hall*, 263 F. 3d 49, 53 (2d Cir. 2001)(facts required to show

an inference of discrimination necessarily vary in each employment discrimination case). The

similarly situated test is not the only means available to Branch.  *Id.* (citing *Abdu-Brisson v. Delta*

*Airlines, Inc.*, 239 F. 3d 456, 468 (2d Cir. 2001)); *Chambers v. TRM Copy Center Corp.*, 43 F. 3d

29, 37-38 (2d Cir. 1994); *See also, Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014)(a case

on which Defendants rely).

Since Dr. Branch was replaced as Program Director by two individuals outside his class, that is sufficient to raise an inference of discrimination. *LittleJohn v. City of New York*, 795 F. 3d 297, 312 (2d Cir. 2015)(inference of discrimination arises when employer replaced demoted or terminated with someone outside of his protected class); *Zimmerman v. Associates First Capital Corp.*, 251 F. 3d 376, 381 (2d Cir. 2001)(replacement by someone outside of protected class sufficient for prima facie case). Even a temporary replacement is sufficient to support a prima facie case. *Hollander v. American Cyanamid*, 172 F. 3d 192, 199 n. 3 (2d Cir. 1999), *abrogated on other ground, by Schanabel v. Abramson*, 232 F. 3d. 83 (2d Cir. 2000).

Moreover, under Defendants' analysis, Dr. McAfee could not be similar situated to Dr. Branch. Dr. Branch was a full time Program Director, while Dr. McAfee is part time. Dr. Branch held the faculty appointment of Clinical Assistant Professor, while Dr. McAfee is an Associate Clinical Professor. Rule56.1 Statement, para. 53. Dr. McAfee holds the title of Vice Chair of Education, whereas Defendants never offered or gave Dr. Branch that title. *Id.* See Fanous Deposition Transcript at 120-121.

The case on which Defendants rely to support their argument that Dr. Branch's replacement with someone outside of his protected class is insufficient to present a prima facie case also is not applicable. In *Mangaroo v.Boundless Technologies, Inc.,* 253 F. Supp. 2d 390, 400 (E.D.N.Y. 2000) the Court addressed whether the plaintiff had shown pre-text by the employer, not whether he had presented a prima facie case.

Another case Defendants cite to argue that Dr. Branch cannot show an inference of discrimination is *Seth*i, 12 F. Supp. 3d 505 (E.D.N.Y. 2014). In that case the Court ruled that

plaintiff's characterization of the events which focused on defendants illegal business activity and fraud did not show racial animus.  *Id.* at 537.

As Mr. Antoine explained, an employee does not have to use the word discrimination in order for ODI to make the determination that his complaint falls within the jurisdiction of ODI. Antoine Decl., para. 7-8.  At no time did anyone from ODI state to Dr. Branch that his complaints did not fall within ODI's jurisdiction.  In any event, Dr. Branch did describe orally to Ms. Moore Goldsmith that he believed race may have been implicated in the behavior of Dr. Michele Pato. Branch Decl., para. 15.  In subsequent complaints to ODI and Human Resources Dr. Branch expressly mentions race discrimination.  See Exhibit 37 annexed to Branch Decl.

With respect  to Defendants' argument that Dr. Branch and Dr. McAfee were treated the same, the record before this Court shows otherwise. While Dr. Fanous demanded that Dr. Branch perform on site clinical services of up to two and half days at KCH, he now only requires Dr. McAfee to perform one day of on site clinical services at KCH.  Defendants also have not presented any evidence that Dr. Fanous cancelled the weekly meetings with Dr. McAfee, the way he did with Dr. Branch.   Nor was the assistance of Dr. Berkowitz on the caliber of the assistance Dr. McAfee receives from the Associate Program Director.  Apparently it is so substantial that Dr. McAfee is able to work only part time as the Program Director.

**Pretext**

Defendants rest their  pretext argument as it relates to Dr. Fanous' non-renewal recommendation of Dr. Branch's faculty appointment, the record before this Court shows that it is a bogus argument.  Defendants assert that Dr. Fanous recommended non-renewal of Dr. Branch's faculty appointment allegedly because he relinquished clinical privileges at KCH, when the

evidence shows that Dr. Carlos Pato set the process in motion at least, as early as February 6, 2018. Exhibit 44 annexed to Parker Decl. The record also shows that Dr. Branch discussed the non-renewal of his KCH privileges with Dr. Fanous at two weekly meetings, where Dr. Fanous said nothing about it. Branch Decl., para. 132-135 and Exhibits 28 and 29 annexed thereto.

The record evidence also shows that after removing Dr. Branch as Program Director, KCH continued to pay his salary despite the fact that he did not provide it with any services, and Dr. Fanous replaced Dr. Branch with Dr. Viswanatham, who also did not provide KCH with any on site services. Branch Decl., para. 40 and Exhibit 41 annexed to Parker Decl.

Next, as to the Evaluative Review Process and Dr. Branch numerous complaints to ODI about his treatment, both avenues of redress were contaminated by President Riley's involvement in the process. Antoine Decl., para. 10-17. He contaminated both review processes. Under the Evaluative Review Process, President Riley was supposed to take a fresh look at the non-renewal recommendation, instead of either rubber stamping a recommendation or affirming a decision he already made not to renew Dr. Branch's faculty appointment.

To prevail against Defendants, Branch has shown and "need only show that the motive to discriminate was one of . . . [Defendants'] motives . . ." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 343 (2013). The record in this case shows that "questions and inconsistencies abound" regarding among other things, Defendants' conduct of demanding Dr. Branch perform work at KCH, his removal as Program Director and the non-renewal of his employment contract. *Chambers*, 43 F. 3d at 38.

Defendants offered a host of conflicting and inconsistent reasons for their conduct. Presently pending before this Court is Dr. Branch's Rule 72(a) Objection, which seeks to depose

President Riley, who according to deposition testimony, directed Branch's removal as Program

Director.  ECF# 134 at 8.  A trier of fact can reasonably infer from the falsity of the explanation"

Defendants present in this case that they are "dissembling to cover up a discriminatory purpose."

*Windham v. Timer Warner Inc.*, 275 F. 3d 179, 188 (2d Cir. 2001)(quoting *Reeves v. Sanderson*

*Plumbing Prds., Inc.* 530 U.S. 133, 147 (2000)).

## Qualified Immunity

Defendants urge application of qualified immunity to Dr. Fanous' conduct,  basing their

argument on the faulty and discredited premise, that all he was doing was enforcing contract terms.

Dr. Fanous' conduct was not based on any reasonable mistake of law or fact, as is required to

shield him from liability under a theory of qualified immunity.  *Pearson v. Callahan,* 555 U.S. 223,

231 (2009).

At best there are disputed issues of fact which preclude that determination at this stage of

the case.  The record before the Court also meets the "but for" standard applicable to Dr. Branch's

claims under 42 U.S. sec. 1983.  *Siani v. SUNY at Farmingdale,* 7 F. Supp. 3d 304, 325 (E.D.N.Y.

2014).

## NYCHRL Claims

The only argument Defendants advance for dismissal of Dr. Branch's claims under the

NYCHRL is the holding of a 2015 case that Dr. Fanous as a state officer cannot be held liable

under the NYCHRL.  *See Soloviev v. Goldstein*, 104 F. 3d 232, 253 (E.D.N.Y. 2015*)*.  That

argument is based on the principle that the state employer must be a party to the action in order to

prosecute a claim against a state employee.  However, there is no requirement that state employers

remain or become parties to a lawsuit, in order to impose liability on the individual defendants.

*See, Tomka v. Seiler Corp.,* 66 F. 3d 1295, 1317 (2d Cir. 1995) *abrogated on other grounds by*

*Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998)(error for district court to dismiss NYSHRL

claims where plaintiff alleged defendants participated in the discriminatory conduct); *Lewis v.*

*Triborough Bridge and Tunnel Authority*, 2001 WL 46986 at * 2, 97 CV 0607 (Jan. 18, 2001),

*aff'd,* 31 Fed. App'x 746 (2d Cir. 2002)(individual liability can be premised on the aiding and

abetting of one's own discriminatory conduct); *Johnson v. County of Nassau*, 82 F. Supp. 3d 533,

538 (E.D.N.Y. 2015)(no requirement that employer remain a party to proceed against individual

employees under aiding and abetting theory).

 The Court did not dismiss Branch's NYCHRL individual capacity claims against Fanous.

See, ECF # 114 at 16.  Branch submits that those claims include hostile work environment and

retaliation, in addition to disparate treatment.  That is so because the Court applied the federal and

state law standard when ruling on the retaliation and hostile work environment claims.  *Mihalik v.*

*Credit Agricole Cheuvreux North America, Inc.*, 715 F. 3d 102, 110, 112, 114 (2d Cir.

2013)(severe and pervasive standard inapplicable to NYCHRL hostile work environment claim);

*Albunio v. City of New York,* 16 N.Y. 3d. 472, 478-479 (2011)(applying a "broad reading" of the

NYCHRL to find that plaintiff engaged in protected activity); *Mihalik*, 715 F. 3d at 112.

**Retaliation**

 While the Court granted Defendants' motion and dismissed the federal and state retaliation

claims, it may exercise its discretion to reconsider its decision regarding the retaliation claims

asserted under federal and state law. *Segendorf-Teal v. County of Ressenlear*, 100 F. 3d 270, 277

(2d Cir. 1996)(court may reconsider its decision prior to final judgment). The Court should

exercise that discretion in this case and revisit the issue of whether Defendants engaged in

retaliatory conduct.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully that the Court deny Defendants' motion for

summary judgment.

Dated:        New York, New York
              April 29, 2021


                              Respectfully submitted,


                       LAW OFFICE OF SANDRA D. PARKER


                       By:  /s/ Sandra D. Parker_____
                              Sandra D. Parker
                              110 East 59th Street, Suite 3200
                              New York, NY 10022
                              (212) 317-2883
                              parkefirm@aol.com
                              Attorney for Plaintiff