```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ROMAIN R. BRANCH,

                        Plaintiff,

        -against-

STATE UNIVERSITY OF NEW YORK and
AYMAN FANOUS, Individually and as Chair of
the Department of Psychiatry, STATE
UNIVERSITY OF NEW YORK DOWNSTATE
MEDICAL CENTER,

                        Defendant.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/17/2023__

18 Civ. 9516 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Romain R. Branch, brings this action against Defendants the State University of New York, the State University of New York Downstate Medical Center, and Ayman Fanous, M.D., alleging employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 200e, *et seq.*; 24 U.S.C. § 1981; 42 U.S.C. § 1983; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec Law § 290, *et seq.*; and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code. § 8-101, *et seq.* See Third Amend. Compl., ECF No. 41. In his third amended complaint, Plaintiff alleges claims for discrimination, retaliation, and hostile work environment, on the basis of his race and national origin. *Id.* ¶¶ 1, 116–40. On February 5, 2020, Defendants filed a motion to dismiss Plaintiff's third amended complaint, Defs. Mot. I, ECF No. 75, and, on July 20, 2020, the Court dismissed Plaintiff's claims for retaliation and hostile work environment, as well as the NYCHRL claims against Fanous in his official capacity, Order, ECF No. 114. Defendants now move for summary judgment on Plaintiff's remaining claims. Defs. Mot., ECF No. 173. For the reasons stated below, the motion is GRANTED.

On March 31, 2022, the Court issued an order that GRANTED Defendants' motion for summary judgment on Plaintiff's claims under Title VII, § 1981, § 1983, and the NYSHRL,

DISMISSED those claims and Plaintiff's claims under the NYCHRL, and DENIED Plaintiff's request for leave to file a supplemental brief. ECF No. 206. The Court informed the parties that this opinion would follow in due course. The Court believed that the opinion had been filed many months ago, but apparently it was inadvertently not entered on the docket.

## BACKGROUND[1]

In December 2015, Plaintiff, a man of "African-American and of Caribbean national origin," was hired as the Director of the Adult Psychiatry Residency Training Program ("Program Director") at SUNY Downstate Medical Center ("SUNY Downstate"). Pl. 56.1 ¶ 1, ECF No 190. Plaintiff was the first and only African-American and person of Caribbean decent to hold this position. *Id*.

The Adult Psychiatry Residency Training Program (the "Program") is a four-year program accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), which sets the Program's training requirements. *Id*. ¶ 4. Medical school graduates in the Program "are trained in the clinical practice of psychiatry by treating patients in clinical settings alongside more experienced clinicians." *Id*. The Program is managed by the Program Director, who reports to the Chair of the Psychiatry Department at SUNY Downstate. *Id*. ¶ 5. The Program Director "recruits and supervises residents, ensures that residents are receiving required training and supervision, oversees all aspects of the training provided to residents, including academic instruction and clinical experience, prepares reports required by the ACGME, and chairs and supervises various committees." *Id*.

SUNY Downstate works with affiliate hospitals which provide funding for its clinical faculty and staff. *Id*. ¶ 7. The terms of these arrangements are memorialized in affiliation agreements. *Id*.

---

[1] The facts in this section are taken from the parties' Rule 56.1 statements, unless otherwise noted. Citations to a paragraph in the Rule 56.1 statement also include the other party's response. The Court considers admitted for purposes of the motion any paragraph that is not "specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). "[W]here there are no citations, or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted).

One of these affiliates is Kings County Hospital Center ("Kings County"), a public teaching hospital located across the street from SUNY Downstate. *Id*. ¶ 8.

Until December 2014, SUNY Downstate had an in-patient psychiatric unit where psychiatry residents trained and treated patients. *Id*. ¶ 9. Before the closure of that unit, Kings County paid approximately 50% of the psychiatry residents' salaries. *Id*. ¶ 10. Kings County also paid 30% of the salary of Michael Myers, M.D., the last Program Director hired prior to the closure of the unit, *id*. ¶ 13; however, it did not pay any of the salary of Stephen Goldfinger, M.D., who filled the Program Director position between Myers and Plaintiff, *id*. ¶ 11.

After the in-patient psychiatric unit was closed, the Program largely operated out of Kings County, which began paying 70% of the residents' salaries. *Id*. ¶ 12. Kings County also increased its contribution to the Program Director's base salary to 54%, which went into effect for the first Program Director hired after the closure, Plaintiff. *Id*. ¶ 13.

In October 2015, Goldfinger, the Chair of the Psychiatry Department and the Program Director, recommended that Plaintiff be appointed as a Clinical Assistant Professor of Psychiatry and as Program Director. *See id*. ¶¶ 11, 14–15. "Plaintiff's appointment as a Clinical Assistant Professor . . . was neither tenured nor on the tenure track, [and] was initially temporary and could be terminated at any time." *Id*. ¶ 18. Goldfinger sent Plaintiff an offer letter describing the terms of Plaintiff's appointment, which included, *inter alia*, that 50% of Plaintiff's time would "be devoted to [his] program director duties" and he would spend a "day a week of clinical/supervisory activities (ideally at the chemical dependency service at [Kings County])." Goldfinger Oct. 2015 Letter at 1, ECF No. 176-5. The letter also explained that a "portion" of Plaintiff's base salary will be for his "work as the program director at [Kings County]." *Id*. Plaintiff accepted the Program Director appointment by signing Goldfinger's letter. *See id*.; Pl. 56.1 ¶ 16.

On December 31, 2015, Plaintiff's appointment went into effect, and he was originally

3

supervised by Goldfinger.  Pl. 56.1 ¶ 17.  On July 1, 2016, SUNY Downstate and Kings County executed an addendum to their affiliation agreement.  *Id*. ¶ 19.  The addendum identified Plaintiff as the Program Director at Kings County.  Addendum at 5, ECF No 176-3.  The parties dispute whether Plaintiff's written job responsibilities required him to spend time at Kings County supervising residents.  Pl. 56.1 ¶ 16.

In August 2016, Fanous replaced Goldfinger as the Chair of the Psychiatry Department, and Plaintiff began reporting to him.  *Id*. ¶¶ 17, 20.  Fanous recommended that Plaintiff's Clinical Assistant Professor position be changed to a two-year term.  *Id*. ¶ 21.  Around May 2017, Fanous nominated Plaintiff to represent the College of Medicine in a minority faculty leadership development seminar sponsored by the Association of American Medical Colleges.  *Id*. ¶ 23.  Plaintiff and Fanous scheduled a weekly meeting to discuss matters related to the Program.  *Id*. ¶ 24.  Fanous cancelled some of these meetings.  *Id*.

When Plaintiff was appointed as Program Director in December 2015, Ellen Berkowitz, who worked in the Residency Training Office since 1989, reported to Plaintiff and supported some aspects of his work.  *Id*. ¶ 34.  Berkowitz also reported to Plaintiff's predecessors, who did not have a formal Associate Program Director.  *Id*. ¶¶ 34–35.  After Berkowitz was promoted, Fanous and Plaintiff began searching for an Associate Program Director in July 2017.  *Id*. ¶¶ 36–37.  Plaintiff posted a vacancy announcement and participated in interviewing candidates.  *Id*.  Fanous updated Plaintiff regarding the Associate Program Director search at their meetings.  *Id*.  During this time, Glenn Occhigrosso, M.D., was appointed as the Site Director at Kings County to help oversee the Program's operations there.  *Id*. ¶ 38.  Fanous also asked Myers to assist with Plaintiff's work, and Plaintiff had assistance from Juliet Arthur, the Program's administrator, who performed clerical duties.  *Id*. ¶¶ 38, 41.

On October 5, 2017, Plaintiff acknowledged that an Associate Program Director had not been

4

hired for reasons beyond Defendants' control.  *Id*. ¶ 39.  He also expressed his belief that not having an Associate Program Director put the Program out of compliance with accreditation requirements.  *Id*.  When Fanous suggested that Occhiogrosso be temporarily assigned the Associate Program Director responsibilities, Plaintiff rejected the proposal because he had concerns about Occhiogrosso's performance.  *See id*. ¶ 40; Pl. Dep. at 310–11, ECF No. 176-29.

As Program Director, "Plaintiff did not provide clinical supervision at Kings County and did not observe the performance of the residents he supervised."  Pl. 56.1 ¶ 25.  In a meeting in August or September 2017 between Fanous, Carlos Pato, M.D., then Dean of the SUNY Downstate College of Medicine, and senior members of Kings County's medical staff, the staff raised concerns about Plaintiff's failure to perform clinical supervision at Kings County.  Pato Decl. ¶¶ 1, 9, ECF No. 181.  They expressed that it was their understanding that Plaintiff "would be based there and would provide regular clinical supervision to the residents there," and that they considered Plaintiff's absence a breach of the terms of the affiliation agreement between Kings County and SUNY Downstate.  *Id*.

On September 7, 2017, Fanous told Plaintiff that Plaintiff may need to begin providing clinical supervision at Kings County because SUNY Downstate and Kings County were renegotiating contracts between them.  *See* Exhibit K at 2, ECF No. 176-11; Pl. Decl. ¶ 79, ECF No. 189; Pl. 56.1 ¶ 28.  On September 29, 2017, Plaintiff asked Fanous to be relieved of all of his clinical responsibilities as of October 1, 2017.  Pl. 56.1 ¶ 29; Exhibit M, ECF No. 176-13.  Fanous denied this request.  Fanous Decl. ¶ 16, ECF No. 177; Pl. 56.1 ¶ 29; *see also* Exhibit M.  On October 26, 2017, Fanous informed Plaintiff that he would need to begin performing extensive clinical work at Kings County starting January 1, 2018.  Exhibit K at 2.  Then, on November 7, 2017, Fanous informed Plaintiff that, as of January 1, 2018, the Program Director position will be funded fully by Kings County and will involve spending 50% of the Program Director's time on clinical responsibilities.  ECF No. 193-14.  Fanous also informed Plaintiff that the Program's office will be physically

relocated to Kings County.  *Id.*[2]

On November 16, 2017, Plaintiff stated that he "would not consent to this planned change in the terms and conditions of [his] contract" and refused to perform clinical work or supervise residents at Kings County.  Exhibit K at 3; *see also* Fanous Decl. ¶ 24.  On November 17, 2017, Fanous informed Plaintiff that, if he did not reconsider his refusal, "[Fanous] would have no choice but to reassign [Plaintiff]."  Exhibit K at 3.  Plaintiff again refused to consent to the planned changes, demanding that Fanous provide him with documentation of the need for him to perform clinical work at Kings County.  *Id*.  Then, on November 29, 2017, Fanous again asked Plaintiff if he would reconsider.  *Id*.  Plaintiff said no, and told Fanous that he was "awaiting formal documentation from [Fanous] regarding these changes."  *Id*.  Fanous kept Carlos Pato apprised of his conversations with Plaintiff regarding Plaintiff's refusal to perform clinical supervision at Kings County.  Fanous Decl. ¶ 29.

Meanwhile, on September 12, 2017, Plaintiff complained to Fanous about an interaction he had with Michele Pato, M.D., a faculty member in the psychiatry department and the wife of Carlos Pato.  Pl. 56.1 ¶ 60.  "According to Plaintiff, . . . [Michele] Pato had been disruptive during [a] meeting, undermining his authority in front of those who were in attendance."  *Id*.  "Fanous informed Plaintiff that . . . Michele Pato would not be involved in the . . . Program for the remainder of the academic year."  *Id*.  In a separate conversation with Shaundelle Moore Goldsmith, the Director of the Office of Diversity and Inclusion ("ODI"), Plaintiff stated that Michele Pato may have behaved that way towards him because she is the "Caucasian spouse of the Dean."  *Id*. ¶¶ 61–62.  Then, on December 6, 2017, Plaintiff emailed Goldsmith a list of incidents that concerned him.  *Id*. ¶ 62; *see generally* Exhibit K.  Plaintiff complained that after he made his complaints about Michele Pato,

---

[2] In December 2017, Fanous decided to abandon the plan to move the Program's physical offices.  *See* ECF No. 193-20.

Fanous started meeting with him less frequently. Pl. 56.1 ¶ 63. Kevin Antoine, the Assistant Vice President for ODI, discussed Plaintiff's concerns with Fanous. *Id*. ¶ 64. Fanous agreed to meet with Plaintiff more frequently. *Id*.

On February 6, 2018, Plaintiff relinquished his clinical privileges at Kings County by stating he would not be able to perform the work at Kings County, which rendered him unable to provide clinical services at that location. *Id*. ¶ 33; Exhibit P, ECF No. 176-16; Pl. Dep. 146–50. Fanous was copied on the emails addressed to Plaintiff about Plaintiff relinquishing his clinical privileges. Exhibit P. Plaintiff informed Fanous of the relinquishment of his clinical privileges on February 7, 2018. Fanous Decl. ¶ 134; *see also* Pl. 56.1 ¶¶ 33, 45. On that same date, Carlos Pato received an email from Karen R. Saunders referencing a discussion Carlos Pato had with human resources on February 6, 2018, the day Plaintiff relinquished his privileges, regarding Fanous needing to issue Plaintiff a non-renewal notice for his appointment as a Clinical Assistant Professor. *See* ECF No. 194-9; Pl. 56.1 ¶ 45. Then, on February 9, 2017, Fanous issued Plaintiff the notice of non-renewal, recommending that Plaintiff's appointment as a Clinical Assistant Professor not be renewed after it expired on December 31, 2018. Pl. 56.1 ¶ 45. Carlos Pato informed Wayne Riley, M.D., the President of SUNY Downstate, that he agreed with Fanous' recommendation to not renew Plaintiff's appointment as a Clinical Assistant Professor. ECF No. 194-11.

On March 23, 2018, Plaintiff sent another list of concerns to ODI. *See* ECF No. 193-37. He complained about his treatment by members of human resources and stated that he was "very concerned that the treatment to which [he has] been subjected by multiple administrative employees of SUNY [Downstate] has been discriminatory and non-standard." *Id*. Plaintiff also expressed that he was "very concerned" that he was being mistreated in retaliation for not accepting "proposed changes to [his] job contract/description" and for filing his complaint involving Michele Pato. *Id*.

In March 2018, Carlos Pato asked David Wlody, M.D., the Designated Institutional Official at

7

SUNY Downstate who reported to Carlos Pato, to meet with Fanous and Plaintiff and explain "why it was important for [Plaintiff] to begin providing clinical supervision at Kings County on a regular basis." Pato Decl. ¶ 14. At a March 15, 2018 meeting with Plaintiff, Fanous, and Wlody, Wlody raised concerns about Plaintiff's failure to perform clinical supervision at Kings County. *Id*. ¶¶ 27, 47–48. Specifically, Wlody explained that it was important for Plaintiff to have a "regular presence at Kings County" because Kings County was paying his salary and "somebody needed to be there to supervise the residents and see firsthand what was happening there." Wlody Decl. ¶¶ 10, 12, ECF No. 182. He also told Fanous and Plaintiff that residents in the Program had raised concerns about their experience. *Id*. ¶ 12. Plaintiff refused to commit to providing clinical supervision at Kings County, Pl. 56.1 ¶ 49; Fanous Decl. ¶ 30; Wlody Decl. ¶ 13, and left the meeting, Wlody Decl. ¶ 13.

Fanous and Wlody then called Carlos Pato to inform him of Plaintiff's behavior. Pato Decl. ¶ 15. Carlos Pato told Fanous and Wlody that Plaintiff would need to decide "then and there" whether he would "begin fulfilling the obligations he had agreed to when he accepted the position as [Program]." *Id*. ¶ 15. Carlos Pato told them that "if [Plaintiff] continued to refuse to provide clinical supervision at Kings County, he could no longer serve as the Program Director." *Id*. Fanous then asked Plaintiff to return to the meeting. Fanous Decl. ¶ 32; Wlody Decl. ¶ 15. Wlody asked Plaintiff to make a decision regarding whether he was willing to provide clinical supervision at Kings County. Wlody Decl. ¶ 15. Plaintiff refused to make a decision, *id*., and again asked for documentation regarding the need for him to provide these services, Pl. 56.1 ¶ 49. Wlody then informed Plaintiff that "since he refused to supervise residents at Kings County, he could no longer serve as Program Director." Wlody Decl. ¶ 15.

After this meeting, on March 19, 2018, Plaintiff recorded a conversion between himself and another doctor, in which Plaintiff told the other doctor that he was fired for refusing to spend half of his time providing clinical services at Kings County. Pl. 56.1 ¶ 50. On March 21, 2018, Plaintiff

8

emailed Goldsmith and Antoine to complain about alleged retaliation.  *Id*. ¶ 65.  Specifically, Plaintiff contended that he was being mistreated in retaliation for his complaint against Michele Pato.  *See* ECF No. 193-38 at 3.  On April 16, 2018, Plaintiff filed another complaint with ODI expressing that he was "treated differently than [his] similarly situated white and non-black colleagues" and was retaliated against based on his complaints against Michele Pato.  ECF No. 193-39.  Then, on April 24, 20218, ODI concluded that it could "not substantiate" Plaintiff's claims.  ECF No. 176-28.  On July 31, 2018, before the expiration of his appointment term, Plaintiff resigned.  Pl. 56.1 ¶ 46.

Following Plaintiff's removal as Program Director, the position was filled by Ramaswamy Viswanathan, M.D., who "was temporarily appointed Interim Program Director . . . until a permanent Program Director could be appointed."  *Id*. ¶ 52.  Viswanathan continued to maintain his positions as "a tenured Professor of Psychiatry, the Director of the Consultative Liaison Service, the Chair of the Grand Rounds Committee, and a member of one of the . . . Program's committees."  *Id*.  He was not compensated for serving as the Interim Program Director and was not otherwise paid by Kings County.  *Id*.  Viswanathan was not required to perform on-site services at Kings County when he served as Interim Program Director.  *Id*.  Occhiogrosso was hired as Viswanathan's Associate Program Director.  *Id*. ¶ 44.

In November 2018, Scot McAfee, M.D., was appointed Program Director.  *Id*. ¶ 53.  McAfee was advised that Kings County is the primary site for the Program, and his offer letter stated that there is a "mutual understanding that most of your professional activity will take place at [Kings County], which is the primary site for the adult residency."  *Id*. ¶ 54.  McAfee provides clinical supervision at Kings County one day a week and performs other work physically at Kings County and in close cooperation with Kings County staff.  *Id*. ¶ 55.  He also maintains an office at Kings County where he regularly meets with residents and staff.  *Id*.  Kings County funds a portion of McAfee's salary.  *Id*.  Although Fanous and McAfee have weekly meetings scheduled, Fanous at

9

times cancels these meetings. *Id*. ¶ 58. In October 2020, Occhiogrosso resigned as the Associate Program Director. *Id*. ¶ 59. Since that time, McAfee has not had the assistance of an Associate Program Director. *Id*.[3]

## DISCUSSION

I. Summary Judgment

    A. Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *See Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In doing so, the non-moving

---

[3] In his deposition, Fanous states that McAfee was not hired as a full-time Program Director because Fanous "believe[s]" he spends "one day a week at Maimonides," another New York City hospital. Fanous Dep. at 120, ECF No. 176-31. Fanous then clarified that McAfee actually does "perform the duties" of a Program Director "five days a week." *Id*. at 121. In McAfee's declaration, he explains that, when he was first appointed Program Director, he continued to work one half day at Maimonides, his prior place of employment. McAfee Reply Decl. ¶ 3, ECF No. 202. But, in October 2019, McAfee stopped working at Maimonides and has since worked for SUNY Downstate five days a week. *Id*. ¶ 4.

party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). In deciding the motion, the court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

Courts must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks and citation omitted).

### B. Claims under Title VII, § 1981, § 1983, and the NYSHRL

The Court shall analyze Plaintiff's claims under Title VII, § 1981, § 1983, and the NYSHRL using the burden-shifting framework for Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir. 1984) (applying the *McDonnell-Douglas* framework to § 1981 claims); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (applying the *McDonnell-Douglas* framework to § 1983 claims); *Olsson v. ABM Taxi Dispatch Laguardia Airport*, No. 18 Civ. 8815, 2020 WL 5038742, at *4 & n.3 (S.D.N.Y. Aug. 26, 2020) (applying the *McDonnell-Douglas* framework to NYSHRL claims for conduct occurring before August 2019).

Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) he is a member of a protected class; (2) he is qualified for the positions he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). Although the plaintiff's burden at this stage is minimal, "it is not . . . nonexistent." *Wellington v. Spencer-Edwards*, No. 16 Civ. 6238, 2019 WL 2764078, at *3

(S.D.N.Y. July 1, 2019); *see also Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 540 (S.D.N.Y. 2007) (explaining how the Second Circuit "recognized that this burden has substance" (quotation marks and citation omitted)).  A plaintiff must point to specific facts that make out the elements of a *prima facie* case, as "[c]onclusory and speculative allegations will not suffice." *Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 388 (S.D.N.Y. 2016).

If the plaintiff makes a *prima facie* case, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse action.  *Ruiz*, 609 F.3d at 492.  If the defendant does so, the burden returns to the plaintiff to demonstrate that the real reason for the action was the plaintiff's protected characteristic.  *Id.*

In his third amended complaint, Plaintiff claims that Defendants discriminated against him by demoting him, not renewing his contract, denying him an Assistant Program Director, and excluding him from meetings.  *See* Third Amend. Compl. ¶¶ 38, 42, 81, 90–95.  Defendants address all of these issues in their memorandum.  *See generally* Defs. Mem.  But, in his opposition to Defendants' motion for summary judgment, Plaintiff argues only that Defendants discriminated against him by (1) demoting him from Program Director and (2) not renewing his contract as a Clinical Assistant Professor.  *See* Pl. Mem. at 18–19, ECF No. 195.  The Court, therefore, deems abandoned Plaintiff's claims regarding Defendants' failure to assign him an Assistant Program Director and their excluding him from meetings.  *See Cruz v. Liberatore*, 582 F. Supp. 2d 508, 528 (S.D.N.Y. 2008).

Defendants argue that Plaintiff cannot show that his demotion and termination were adverse employment actions because they resulted from Defendants enforcing the terms of his employment. Defs. Mem. at 17–18.  The Court disagrees.  The question is not why Defendants took these actions, but whether these actions were taken.  As stated in this Court's order on Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), demotion and termination of employment are examples of adverse employment actions that can form the basis of a claim for employment

discrimination. *See* Order at 5–6 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). The Court, therefore, finds that the undisputed facts show that Plaintiff was subjected to adverse employment actions when Defendants removed him from the Program Director position and did not renew his contract as a Clinical Assistant Professor.

Defendants next argue that Plaintiff cannot establish a *prima facie* case because the undisputed facts show that these adverse actions did not take place under circumstances giving rise to the inference of discrimination. Defs. Mem. at 18–23.

The Court agrees that Plaintiff has not met his burden of showing that Defendants' non-renewal of his Clinical Assistant Professor position took place under circumstances giving rise to the inference of discrimination. Plaintiff has presented no facts showing that Fanous, or any other decisionmakers involved in the non-renewal of his contract, made any discriminatory or disparaging remarks about Plaintiff's race or national origin. And, Plaintiff does not identify who replaced him as Clinical Assistant Professor, or that he was treated differently from other similarly situated Clinical Assistant Professors outside of his protected groups.

However, the Court concludes that Plaintiff has established a *prima facie* case with regard to his demotion. Plaintiff contends that he can make out a *prima facie* case merely by showing that he "was replaced as Program Director by two individuals outside his class." Pl. Mem. at 20. The Court agrees. *See Littlejohn v. City of New York*, 795 F.3d 297, 312–13 (2d Cir. 2015). The undisputed facts show that both Plaintiff's temporary and permanent replacements were not African-American or of Caribbean national origin. *See* Pl. Decl. ¶¶ 36, 161. And, as the Second Circuit has stated, "'the evidence necessary to satisfy th[e] initial burden' of establishing that an adverse employment action occurred under circumstances giving rise to an inference of discrimination is 'minimal,'" and "[t]he fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the . . . analysis." *Littlejohn*,

795 F.3d at 313 (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).

To rebut Plaintiff's *prima facie* case, Defendants argue that the undisputed facts show that they had a legitimate, non-discriminatory reason for removing Plaintiff as Program Director—that Plaintiff refused to provide clinical supervision to the residents at Kings County.  Defs. Mem. 24–25. Plaintiff contends that Defendants' reason for his removal is pretextual because: (1) Kings County continued to pay his salary after he was removed as Program Director despite his not providing them with any services; (2) Viswanathan, Plaintiff's temporary replacement, did not provide Kings County with any on-site services; and (3) "questions and inconsistencies abound" regarding Defendants' demanding that Plaintiff perform work at Kings County.  Pl. Mem. at 22 (citation omitted).

The Court rejects Plaintiff's argument that Kings County's continued funding of his salary after his removal from the Program Director position shows that Defendants did not remove Plaintiff because of his refusal to provide clinical services.  Plaintiff offers no explanation as to why this fact would demonstrate pretext.  *See generally id*.  Moreover, Defendants represent, and Plaintiff does not contest, that Plaintiff "resigned before the sources of his salary support could be adjusted to reflect the fact that he was no longer the Program Director."  Clinchy Reply Decl. ¶ 10, ECF No. 201; ECF No. 93 at 9.  No reasonable jury would determine that a delay in adjusting Plaintiff's funding demonstrates that Defendants did not remove him as Program Director because of his failure to provide clinical services at Kings County.

Plaintiff's second argument also fails.  The undisputed facts show that Viswanathan served as an interim Program Director who temporarily replaced Plaintiff from March 2018 until a permanent replacement could be hired in November 2018.  Pl. 56.1 ¶¶ 52–53.  Unlike Plaintiff, Viswanathan continued to hold multiple other positions and was not paid for his service as the interim Program Director by SUNY Downstate or Kings County.  *Id*. ¶ 52.  Furthermore, McAfee, the next permanent

Program Director, does receive part of his salary from Kings County and provides clinical supervision there once a week. *Id.* ¶ 55. Thus, no reasonable jury would conclude that Viswanathan's situation supports Plaintiff's argument.

The Court also finds Plaintiff's third argument unpersuasive. Plaintiff contends that Defendants' reasons are pretextual because they continually increased the time he would need to spend at Kings County and that, although they ordered him to spend 50% of his time at Kings County, they required that his successor, McAfee, to spend only one day a week at Kings County. Pl. Mem. at 8–9. Plaintiff also argues that Defendants provided no documentation of the alleged renegotiations with Kings County that they used to justify these requests to Plaintiff, the ODI, or this Court. *Id.* at 9–10. But, even though Plaintiff identifies some discrepancies in Defendants' reasoning, he does not put forward any facts that contest the heart of Defendants' stated reason—they wanted him to provide clinical services at Kings County and he refused to do so. Therefore, "even if . . . facts are in dispute" regarding how much time Plaintiff needed to spend at Kings County and the reasons for this need, Plaintiff "cannot demonstrate that [D]efendants' proffered reasons for [his] termination were so unfounded that a reasonable jury could conclude that they were not the [D]efendants' true reasons, but rather a pretext." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117–18 (2d Cir. 2010) (quotation marks and citation omitted).

Moreover, even assuming, *arguendo*, that Plaintiff has raised sufficient facts to show that Defendants' reason is pretextual, a rejection of a defendant's proffered reasons does not compel judgment for the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Indeed, once a defendant has put forward reasons in support of its decision, the presumption created by the *prima facie* case, "having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Id.* at 510–11. The plaintiff must not only put forth "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons

15

proffered by the [defendant] were false," he must also show that "that more likely than not discrimination was the real reason for the [adverse employment action].'" *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (citation and alteration omitted).

Thus, even though Plaintiff's evidence is "sufficient to raise a fact question as to pretext," it "fails to warrant a jury trial." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93–94 (2d Cir. 2001), *as amended* (June 6, 2001). As discussed above, the only evidence that supports Plaintiff's *prima facie* case of racial discrimination is the fact that he was replaced by someone outside of his protected groups. Although this evidence is sufficient to satisfy the minimal burden at the *prima facie* stage, it does not carry his burden of showing that he was treated adversely for discriminatory reasons. *See Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000).

Accordingly, Plaintiff's claims under Title VII, §1981, § 1983, and the NYSHRL are DISMISSED.

### C. Retaliation Claims

In his memorandum opposing summary judgment, Plaintiff argues that the Court "should exercise [its] discretion . . . and revisit the issue of whether Defendants engaged in retaliatory conduct," without explaining why it should do so. Pl. Mem. at 24–25. By letter dated August 9, 2021, Plaintiff requests leave to file a supplemental brief discussing how the Second Circuit's decisions in *Lynch v. City of New York*, 952 F.3d 67 (2d Cir. 2020) and *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293 (2d Cir. 2021) "further support his argument . . . that the Court should exercise its discretion and revisit the decision dismissing the . . . retaliation claims." ECF No. 204.

To the extent that Plaintiff attempts to argue for reconsideration of the Court's July 20, 2020 decision dismissing his retaliation claims, *see* Order, this request, made over ten months after this

16

Court issued that decision, is untimely. *See*, *e.g.*, *Munn v. APF Mgmt. Co. LLC*, 2021 WL 2355308, at *2 (S.D.N.Y. Jun. 9, 2021). Moreover, Plaintiff has not explained why the two cited cases cast doubt on this Court's decision, and the Court is not persuaded that they do.

Accordingly, Plaintiff's request that the Court revive his retaliation claims and allow him to file a supplemental brief is DENIED.

### D.  Claims Under the NYCHRL

A district court has discretion to "decline to exercise supplemental jurisdiction" where, as here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Where all federal claims are eliminated before trial, "the balance of factors to be considered under the pendent jurisdiction doctrine . . . point toward [a federal court] declining to exercise jurisdiction over the remaining state [and city] law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring).

Because the NYCHRL sets out a different, more liberal standard for discrimination claims, which the Court has not considered in this opinion, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYCHRL. Accordingly, those claims are DISMISSED without prejudice to renewal.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims under Title VII, § 1981, § 1983, and the NYSHRL. The Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the NYCHRL, and, therefore, those claims are DISMISSED without prejudice to renewal in state court. Plaintiff's request that the Court revisit its decision dismissing his retaliation claims and allow him leave to file a supplemental brief is DENIED.

The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: January 17, 2023
       New York, New York

_____
ANALISA TORRES
United States District Judge